**STANLEY LABORATORIES, Inc., et al. v. FEDERAL TRADE COMMISSION.**

No. 10149.

Circuit Court of Appeals, Ninth Circuit.

Oct. 20, 1943.

---

[5] The General Lincoln, D.C.Md.1928, 24 F.2d 441.

Leo Levenson, of Portland, Or., and James J. Hayden, of Washington, D. C., for petitioners.

W. T. Kelley, Chief Counsel, F.T.C., Joseph J. Smith, Jr., Asst. Chief Counsel, and Jno. W. Carter, Jr., Sp. Atty., F.T.C., all of Washington, D. C., for respondent.

Before GARRECHT, STEPHENS and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

The single issue here presented is whether there is substantial evidence to support the respondent's findings that the petitioners' use of the letters "M.D.", either alone or in conjunction with the picturization of a doctor, nurse, or cross, in connection with a medicated douche powder put out by the petitioners, is deceptive in that it tends to lead the public to believe that the powder is endorsed by the medical profession or by the American National Red Cross.

This is an original proceeding upon a petition to review and set aside an order to cease and desist issued by the respondent, pursuant to a complaint charging petitioners with engaging in unfair and deceptive acts and practices in commerce, in violation of the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq.

The complaint alleged that the petitioners sold and transported in interstate commerce certain drug products for feminine hygiene, including "MD Medicated Douche Powder"; that the petitioners in the course of their business disseminated false advertisements concerning their products; that by the use of the letters "MD" in designating their products, the petitioners made "false, deceptive and misleading representations to the effect that their products are either prescribed or compounded by physicians or that they bear the endorsement or recommendation of the medical profession."

In their answer, the petitioners alleged that they had long since discontinued the sale of all the products referred to in interstate commerce, except the MD powder, and denied that the use of the letters "MD" was intended to deceive or mislead, or did in fact deceive or mislead the public into the belief that MD powder was endorsed or recommended by the medical profession generally.

As furnishing the setting for the respondent's cease and desist order, the following admissions in the brief of the petitioners are significant:

1. The petitioners disseminated false advertisements through the United States mails, for the purpose of inducing the purchase of their products.

2. The petitioners, by means of those false advertisements and otherwise, represent, directly and by implication, that the douche powder "is a recent development of scientific research which is endorsed by leading physicians and surgeons."

3. By the use of the term "Laboratories" in their corporate and trade name, the petitioners represented that they owned a laboratory equipped for the compounding of medicinal preparations and for research in connection therewith; whereas "In truth and in fact, the [petitioners] neither own nor control any * * * laboratory wherein their medicinal preparations are compounded or wherein any research activities are conducted."

These admissions in the brief refer specifically to certain paragraphs in the "Findings as to the Fact" filed by the respondent. In addition, there are other admissions in the record, which are not, however, repeated in the petitioners' brief:

1. The false advertisements referred to above had the capacity and tendency to mislead a substantial portion of the buying public, and did cause a portion of such public to purchase the petitioners' preparations.

2. The use by the petitioners of such descriptive words and phrases as "dependable", "insure—personal hygiene", "dependable safeguard", and "effective, reliable antiseptic powder" in referring to the MD Medicated Douche Powder has a tendency to cause prospective purchasers to believe that the preparation is a preventive against conception and a germicide which will combat any form of bacteria; whereas the preparation is not such a preventive, and is not an adequate prophylactic.

The petitioners in their pleadings have sought to qualify their various admissions by reference to a "stipulation" filed by their attorney on January 31, 1940. Similarly, one of the three "points" in their brief is that this "stipulation" "makes a cease and desist order improper and unnecessary in this case."

Nowhere do the petitioners give us a record reference to such a "stipulation", nor do they attempt to outline its provisions. Our own independent scrutiny of the transcript convinces us that there was no such stipulation. The document to which the petitioners apparently refer is a letter from their counsel addressed to the respondent, *offering* a stipulation to cease and desist from certain representations, which letter is one of the unprinted exhibits herein. This offer was not accepted by the respondent; but even if it had been, it would not have constituted a defense to the present proceedings. Federal Trade Commission v. Goodyear Tire Company, 304 U.S. 257, 260, 58 S.Ct. 863, 82 L.Ed. 1326; Philip R. Park, Inc., v. Federal Trade Commission, 9 Cir., 136 F.2d 428, 430. Furthermore, the proffered stipulation did not relate to the use of the initials "MD", which is the core of the present controversy. On the contrary, the letter in question insisted on the petitioners' right to continue the use of those initials.

Indeed, the second paragraph of the very letter that is so insistently relied upon by the petitioners virtually concedes the unlawful character of their advertising: "I am satisfied from my examination of the law applicable to this matter that the advertising heretofore employed by my clients is in apparent violation of the law in most of the particulars set forth in the proposed stipulation forwarded to my clients by your office. * * *"

The advertisements themselves, which are exhibits in this case, amply justify counsel's misgivings. They are of a deceptive and generally reprehensible character. One contains the photograph of a young woman in a trained nurse's garb, speaking into a telephone. Above the picture is the caption, in quotation marks: "Yes * * * M.D. is Decidedly Better." Another advertisement carries the picture of a young woman, also at the telephone who is represented as saying: "Thank you * * * for your Advice, Doctor!" A third piece of publicity consists of the photograph of an elderly, bespectacled man wearing a Vandyke beard, and above is the caption "Your Doctor Will Tell You—". Still others show pictures of women wearing expressions of pain and anxiety, with such captions as "Why Risk Your Health and Beauty?", "Now let's look at this thing sensibly", "You, too, should change to M.D." And invariably and inevitably, the initials "M.D."—with or without the periods after the letters—are prominently displayed in the body of the advertisements.

With this background, we turn to the testimony bearing on the specific question as to whether the use of the initials "M.D." in connection with the medicated douche was calculated to mislead or did in fact mislead the general public.

The respondent offered the testimony of five physicians to the effect that the public is led to believe that the letters "MD" on MD Medicated Douche Powder mean that the product is endorsed by the medical profession. The petitioners seek to brush this testimony aside with the flippant comment that "such clairvoyance should be rejected by a court of law as beyond the scope of the medical profession." But it *is* decidedly within the scope of the medical profession to caution patients against the dangers of self-diagnosis, self-treatment, and self-medication, and the indiscriminate use of patent medicine; and in the discharge of this duty physicians acquire considerable insight into purchasing psychology of their patients. As was said in Benton Announcements, Inc., v. Federal Trade Commission, 2 Cir., 130 F.2d 254, 255: "Persons whose business carries them among the buyers of a product are certainly qualified sources of information as to the buyers' understanding of the words they hear and use." So in the instant case, physicians would be well qualified to testify as to what patients would understand by the legend "M.D." on a container of medicated douche.

Indeed, there is testimony in this record on this precise point. Dr. R. Phillip Smith, a specialist in obstetrics and gynecology, said:

"I think one thing that stands out in my mind is the fact that these douche powders are put on the market for patients who go into the drugstore and ask for something to use for a douche and the druggist gives them this, and they start using * * * it, and get into some very dire effects sometimes.

"Part of my business is getting patients out of trouble that have gotten themselves in with patent medicines or drugs that they have used over a period of time."

Certainly it is part of a practitioner's professional duty to ascertain what *makes* women purchase such nostrums, for thus he can more effectively warn them against the dangers of self-medication.

Furthermore, the petitioners are in error when they state that "All of the Commission doctors testified that they were not deceived by the use of the letters 'MD' or by the use of the likeness of a nurse, or a doctor, or a cross." Some of the experts did testify that they knew that no *reputable* physicians would endorse such a product; but there was other medical testimony to the effect that some of the expert witnesses themselves were misled or at least confused by the use of the initials. For instance, Dr. Norman A. David, a teacher at the University of Oregon Medical School, testified:

"The only interpretation I have of the letters 'M.D.' is that it refers to Doctor of Medicine, and therefore would be a product that is endorsed by doctors. The letters stand for 'Medical Doctor', and naturally that is what one would think.

* * * * * *

"It would make me think that the powder is possibly recommended by a physician, but I must supplement that statement be-. cause I know that no physician, reputable, ethical physician, sells or puts his approbation on any douche powder. He may prescribe them, or write prescriptions for them, but I do not think that the doctor would sell this with the idea that other physicians and surgeons—"

Despite his professional knowledge that a reputable physician would not sell or endorse a douche powder, Dr. David, even at the time he gave the testimony, was not sure whether or not a physician was not in some way connected with the product in question; for near the close of his testimony he said:

"I didn't think—*I don't know yet*—whether or not the formula has been devised by a physician but the inference is that it has the backing of the medical profession." [Italics our own]

The doctor was not here endeavoring to perform any feat of "clairvoyance", but was expressing his own honest doubt as to any possible medical connection with MD Douche Powder.

On cross-examination, Dr. Thomas R. Montgomery, a Portland urologist, testified without hesitation that the initials "MD" following even the word "Baltimore" in capitals, might under some circumstances lead him to think that "Baltimore" was a doctor, if that combination appeared on a package of medicine.

In their brief, the petitioners assert that Dr. Albert Holman "aptly expressed the attitude of all the doctors who testified that they were not deceived into thinking MD Medicated Douche Powder was endorsed by the medical profession when he said" that he well knew that it was not. An examination of the record, however, discloses that the question to which Dr. Holman made a negative reply was merely as to whether or not the letters "M.D." constitute a "medical term". The question made no mention whatever of medical endorsement. On the precise point in issue, however, Dr. Holman indicated that the abbreviation "M.D." would mislead him as to the fact of *some* claimed endorsement sufficiently to cause him to inquire into the qualifications of the physicians who were said to have recommended the product.

■ Several lay witnesses testified that the petitioners' advertising matter gave them the impression that the medical profession made or endorsed MD Powder. Counsel objected to the "groundwork" laid for that testimony. As we shall see later, however, such technical objections are out of place in the consideration of testimony given before an administrative board such as the Federal Trade Commission. Furthermore, each lay witness was shown specimens of the petitioners' advertising in open court, and was asked what came to his mind when he examined them, and why. This method of examining the witnesses was entirely proper, since the issue to be determined was whether or not the

letters "M.D." were misleading to the public.

There is evidence in the record, too, that the deception in question was intentional. Henry M. White, in charge of the respondent's office in Seattle district, testified that he interviewed Edward A. Bachman, president of the Stanley Laboratories, Inc., one of the petitioners herein, and that Bachman made the following statement to him: "Then Mr. Bachman stated he simply assumed the name M.D., it was suggested to him by an advertising man, and the argument used was that it would lead the public to believe that it was medicated, and that the picture of the nurse on the label would indicate cleanliness, and he wanted to convey the impression, without baldly stating the fact, that the product had been endorsed by the Medical Association." Bachman denied that he had made the statement. In view of the welter of admittedly false advertising that had been put out by Bachman's company, however, we think the respondent was justified in believing White rather than Bachman.

■ The petitioners contend that the respondent's order to cease and desist was not based upon substantial evidence, but "upon a distorted construction of the testimony, much of which was wholly inadmissible, and incredible." We have summarized sufficient of the testimony, most of which was admitted without objection, to show that it was "substantial". We turn now to the questions of whether or not it was "admissible", and whether or not this court has the right to say that it was "incredible".

In Opp Cotton Mills v. Administrator of Wage and Hour Division, 312 U.S. 126, 155, 657, 61 S.Ct. 524, 537, 85 L.Ed. 624 Mr. Justice [now Chief Justice] Stone said:

"The argument of petitioners is not that the record contains no evidence supporting the findings but rather that this class of evidence must be ignored because not competent in a court of law. But it has long been settled that the technical rules for the exclusion of evidence applicable in jury trials do not apply to proceedings before federal administrative agencies in the absence of a statutory requirement that such rules are to be observed. [Cases cited.] We need not consider whether this class of evidence must be excluded from proceedings in court.

"Further the documents in question were received in evidence without objection. And even in a court of law if evidence of this character is admitted without objection it is to be considered and must be accorded 'its natural probative effect as if it were in law admissible.' [Cases cited.]"

In John Bene & Sons v. Federal Trade Commission, 2 Cir., 299 F. 468, 471, cited with approval in the Opp Cotton Mills case, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624, supra, the court said: "We are of opinion that evidence or testimony, even though legally incompetent, if of the kind that usually affects fair-minded men in the conduct of their daily and more important affairs, should be received and considered; but it should be fairly done."

And in Arkansas Wholesale Grocers' Ass'n v. Federal Trade Commission, 8 Cir., 18 F.2d 866, 871, certiorari denied 275 U.S. 533, 534, 48 S.Ct. 30, 72 L.Ed. 411, the following language was used: "Error is assigned because of alleged incompetent testimony at the hearings. This assignment cannot be entertained provided there is any substantial competent testimony to support the findings." See, also, Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 230, 59 S.Ct. 206, 83 L.Ed. 126; Hills Bros. v. Federal Trade Commission, 9 Cir., 9 F.2d 481, 484, certiorari denied 270 U.S. 662, 46 S.Ct. 471, 70 L.Ed. 787; Keller v. Federal Trade Commission, 7 Cir., 132 F.2d 59, 61; Ellers v. Railroad Retirement Board, 2 Cir., 132 F.2d 636, 639.

■ The petitioners complain that on cross-examination the lay witnesses stated merely that the letters "MD" gave the "impression" that doctor approved of the powder. But "impressions" are the primary targets of the ad-writers. As was well said in Aronberg v. Federal Trade Commission, 7 Cir., 132 F.2d 165, 167, where, as here, a preparation related to feminine hygiene was involved: "To an educated analytical reader, these and similar statements may not seem to claim anything more than to relieve delayed menstruation. But the buying public does not ordinarily carefully study or weigh each word in an advertisement. The ultimate impression upon the mind of the reader arises from the sum total of not only what is said but also of all that is reasonably implied. As we said in D.D.D. Corporation v. Federal Trade Commission, 7 Cir., 125 F.2d 679, 681:

'Petitioner argues this phrase ["for quick relief from itching of eczema, etc."] can only refer to itching, and that there is no implication the product is a remedy or relief for such diseases. We think there is merit in petitioner's contention that this and similar statements, when carefully scrutinized, may be thus construed. The weakness of this position, however, lies in the fact that such representations are made to the public, who, we assume, are not, as a whole, experts in grammatical construction. Their education in parsing a sentence has either been neglected or forgotten. We agree with the Commission that this statement is deceptive and calculated to be deceiving to a substantial portion of the public.' The law is not made for experts but to protect the public,—that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions. [Cases cited.] Advertisements must be considered in their entirety, and as they would be read by those to whom they appeal. [Cases cited.] If the Commission, having discretion to deal with these matters, thinks it best to insist upon a form of advertising clear enough so that, in the words of the prophet Isaiah, 'wayfaring men, though fools, shall not err therein', it is not for the courts to revise its judgment. Advertisements are intended not 'to be carefully dissected with a dictionary at hand, but rather to produce an impression upon' prospective purchasers. [Case cited.]"

■ By a parity of reasoning, the foregoing observations apply equally to that part of the cease and desist order that forbids the petitioners' "use of picturization of a cross or any other simulation of the American Red Cross emblem, either alone or in conjunction with the picturization of a doctor or a nurse". It may be added, however, that the commercial imitation of the American Red Cross emblem is prohibited by Federal statute. See 36 Stat. 604, c. 372, 36 U.S.C.A. § 4.

Harking back to the days of King Arthur, the petitioners assert that "hundreds of other articles of merchandise are sold bearing the label which includes a cross similar to that used by the American Red Cross." They also complain that the respondent recently "dismissed a complaint charging deception in the use of the letters M.D. on a toilet tissue."

■ The obvious answer to all this, of course, lies in the truism that two wrongs do not make a right. Furthermore, each case is to be judged in accordance with its own facts; and we do not have the facts in the toilet-tissue case before us, even if it were proper for us to consider them.

As far as Sir Galahad is concerned, the Federal statute cited above forbids the use of the Red Cross emblem only after January 5, 1905. We take judicial notice of that fact that any use of the insignia that may have been made by the "chaste knight" was prior to that date.

Above and beyond the oral evidence in this case—evidence which, we repeat, is both substantial and impressive—stands the mute and accusing testimony of the thing itself. We have examined the advertising matter and the container put out for the petitioners' douche powder. Like the Commission, we too have noticed that blatant emphasis on the letters "MD". We too have discerned the attempt—and, we believe, the conscious attempt—to capitalize upon the prestige of a profession that, for all its blunders and ineptitudes, from the very days of Hippocrates and Galen has built up a noble tradition of self-sacrifice and service to humanity.

■ We agree with the conclusion of the respondent that the use of the letters "MD" is deceptive. But even if we did not, we should be compelled to affirm the order, since it is supported by substantial evidence.

Accordingly, the respondent's order is affirmed, and the petitioners are commanded to obey its terms.

Affirmed.