Abel Allan GOODMAN, an individual
trading as Weavers Guild,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 15124.

United States Court of Appeals
Ninth Circuit.

April 17, 1957.

Wolver & Wolver, Eugene L. Wolver, Los Angeles, Cal., for petitioner.

Earl W. Kintner, Gen. Counsel, Robert B. Dawkins, Asst. Gen. Counsel, Emerson K. Elkins, Washington, D. C., for respondent.

Before LEMMON and CHAMBERS, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

The Federal Trade Commission, the respondent herein, to be referred to as "the Commission", after an investigation of the practices of Abel Allan Goodman, an individual trading as "Weavers' Guild", to be referred to as "the petitioner", filed a complaint on December 22, 1953, charging him with violation of § 5(a) (1) and § 5(a) (6) of the Federal Trade Commission Act.[1]

## I.

### The Proceedings Under Review.

In substance, the complaint charged that by the use of the words "Weavers' Guild" the petitioner had represented himself that his business was an organization or guild of weavers organized to protect the interests of its members, and that, for the purpose of obtaining salesmen in connection with the sales and distribution of his home study course of instruction in a method of repairing damage to cloth, he had caused to be published in interstate commerce advertisements, and false, misleading and deceptive statements as to the prospective earnings of such salesmen and the assistance which would be given to them. And for the purpose of inducing the salesmen to sell the course of instruction he had made false, deceptive and misleading claims and representations concerning the course and the benefits which would accrue to those purchasing it.

These representations will be treated with greater specificity as we discuss the findings made by the Commission and the attack made on them by the petitioner.

The petitioner filed his answer on January 11, 1954, in which he admitted that he *formerly* sold and distributed in inter-

1. 15 U.S.C.A. § 45(a) (1) and § 45(a) (6).

state commerce the course mentioned, but claimed that he no longer did so, but was, at the time,

"only engaged in the liquidation and winding up of the business."

He also denied that certain of the representations were made either by him or in his behalf and claimed that others were true.

A Hearing Examiner was designated and hearings were held in Los Angeles, San Francisco and New Orleans. Twenty-two witnesses were presented for the Commission, nine for the petitioner. The Examiner filed his Initial Decision on September 23, 1955. On appeal, the Commission, on March 14, 1956, denied petitioner's appeal and granted, in part, the appeal in support of the complaint. The order issued by the Commission differed in one respect, to be adverted to later, from that recommended by the Examiner. In substance, the Order required the petitioner, in conjunction with the sales and distribution of the course of instruction of reweaving in commerce to cease and desist from:

1. Representing, directly or by implication:

(a) That the typical earnings of persons selling petitioner's course of instruction are greater than they actually are;

(b) That the petitioner will furnish sales leads or other selling assistance to those selling his course of instruction unless he actually does furnish such leads and assistance;

(c) That sales kits and other advertising material are furnished to sales agents, unless it is clearly disclosed that such articles are furnished only after the agents have made deposits or payment therefor;

(d) That the petitioner's course of instruction constitutes a complete course in reweaving unless and until such is in fact true;

(e) That reweaving is easily learned, or quickly learned, by taking the petitioner's course, unless such representation be specifically restricted to the over-weaving or patch type of reweaving;

(f) That the petitioner will arrange for personal instructions for those purchasing his course;

(g) That the potential earnings of persons completing the petitioner's course and engaging in the reweaving business are greater than they are in fact;

(h) That the needles supplied with the course are worth any amount in excess of the amount ordinarily charged for such needles by the petitioner;

(i) That the petitioner will refund payments made on contracts unless he in fact makes such refunds upon demand by the purchasers;

(j) That the petitioner's courses of instruction have been approved for training by the Bureau of Education of the State of California or the United States Veterans Administration.

2. Using the word "Guild" in his trade name or otherwise;

3. Representing, directly or by implication, that his business is anything other than a private business enterprise selling a correspondence course of instruction in reweaving, unless such representation is true.

## II.

### The Scope of Review.

This is a petition to review the order. Under the Federal Trade Commission Act, the findings of the Commission as to facts, if supported by evidence, are conclusive.[2]

In an Opinion just filed,[3] we had occasion to treat fully the scope of review under this statutory mandate and the impact of the Administrative Procedures Act[4] on it. The conclusion there stated was that the function of this

---

2. 15 U.S.C.A. § 45(c).

3. De Gorter v. Federal Trade Commission, 9 Cir., 244 F.2d 270.

4. 5 U.S.C.A. § 1009(e).

Court is merely to make a comprehensive review of the record before the Commission and to determine if the findings are supported by substantial evidence on *such record considered as a whole.*[5]

In exercising the right of review, we are aware that the growing complexity of our economy has induced the Congress to place upon specialized agencies the power to regulate certain phases of it and to control the abuses in them. For this reason, the Supreme Court has stated, *both as a policy and as a warning:*

"Courts are slow to interfere with their conclusions when reconcilable with statutory directions."[6]

### III.

### The Status of the Salesmen.

The petitioner's primary contention is that the salesmen who sold the course were *independent contractors,* for whose actions he was not responsible. The brunt of the argument is based on the claim that because the petitioner carried the salesmen on his books as independent contractors, his agreements with them so stated, and he had no control over their work and the manner of performing it, the connection between him and his salesmen conformed to the classical characteristics which courts have attached to that relationship.

The criteria of direction and control, which govern in determining whether or not such relationship exists, are well recognized in law. However, even the general criteria are not applied with rigid consistency. And in the authori-

ties[7] there are references to cases in which salesmen have been held to be agents of the principal notwithstanding assertions of a different relationship. However, when interpreting a statute the aim of which is to regulate interstate commerce and to control and outroot some evil practices in it, the courts are not concerned with the refinements of common-law definitions, when they endeavor to ascertain the power of any agency to which the Congress has entrusted the regulation of the business activity or the enforcement of standards it has established.

Illustrative is a case which arose under the National Labor Relations Act[8] involving the definition of the word "employee" as used in that Act. There was before the Supreme Court the important question whether newsboys who, by ordinary criteria—because they purchase the newspapers at a definite price and resell them, and, in many other respects —would be considered independent contractors, were within the Act.[9] Ruling in the affirmative, the Court rejected the contention that common-law concepts should be read into statutes of this character, saying:

"It will not do, for deciding this question as one of uniform national application, to import wholesale the traditional common-law conceptions or some distilled essence of their local variations as exclusively controlling limitations upon the scope of the statute's effectiveness. To do this would be merely to select some of the

---

5. See, Jacques and Suze C. De Gorter, trading as Pelta Furs, v. Federal Trade Commission, supra, Note 3; and see cases cited in Notes 6 to 13 inclusive. The present state of the law is well summed up by the Court of Appeals for the Fourth Circuit:
 "Conflicts in testimony are to be resolved by the Commission and not by us whose function is limited to determining whether upon a review of the whole record it appears that the Commission's findings are supported by substantial evidence. The weight to be given to the facts proved and the inferences to be drawn from them are for the Commission

to determine, not the courts." Bristol-Myers Co. v. Federal Trade Commission, 4 Cir., 1950, 185 F.2d 58, 62.

6. United States v. Storer Broadcasting Co., 1956, 351 U.S. 192, 203, 76 S.Ct. 763, 100 L.Ed. 1081.

7. 2 Am.Jur., Agency, § 8; 2 C.J.S. Agency § 2(d); 35 Am.Jur., Master & Servant, § 5; 56 C.J.S. Master and Servant § 3; Restatement, Agency, § 2(c), § 220(2) (c).

8. 29 U.S.C.A. § 152 et seq.

9. National Labor Relations Board v. Hearst Publications, 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170.

local, hairline variations for nation-wide application and thus to reject others for coverage under the Act."[10]

The courts adopted a similar attitude under the Fair Labor Standards Act [11] when it was urged that homeworkers working on a piece basis, not under the direct control of the employer, were not employees, but independent contractors.[12]

The gloss of these cases is that, in dealing with a regulatory statute aimed to achieve a greater societal control through specialized agencies, the courts should disregard common-law definitions. Rather, should they envisage the legislation as a whole, the evils it sought to eradicate or the control which it aimed to achieve and interpret the words used with these objectives in view. As said by the Court of Appeals for the Sixth Circuit:

"We are dealing, however, with a specific statute which, * * * is of a class of regulatory statutes de signed to implement a public social, or economic policy through remedies not only unknown to the common law but often in derogation of it. * * * If the Act presently considered, expressly or by necessary implication, brings within the scope of its remedial and regulatory provisions, workers in the status here involved, we are not concerned with the question whether a master-servant relationship exists under other-wise applicable rules of the common law."[13]

The statute under which the present proceeding was instituted declares unlawful,

"Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce."[14]

And the Commission is empowered to prevent persons

"from using unfair methods of competition in commerce and deceptive acts or practices in commerce."[15]

The courts in interpreting the particular statute have stressed the fact that one who

"places in the hands of another a means of consummating a fraud or competing unfairly in violation of the Federal Trade Commission Act is himself guilty of a violation of the Act." [16]

So when they found that there were unfair or deceptive acts in conjunction with the sale or advertising of a product or service in commerce, they held the seller or manufacturer responsible whether the salespersons were what might have been considered at common law independent contractors or not. All they were interested in was to determine whether misrepresentations were made within the *apparent scope* of the authority of the salespersons.

10. National Labor Relations Board v. Hearst Publications, supra, Note 9, 322 U.S. at page 125, 64 S.Ct. 851, at page 857. As stated in another case, "It is the total situation that controls." Bartels v. Birmingham, 1947, 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947.
And see, United States v. Silk, 1947, 331 U.S. 704, 716–718, 67 S.Ct. 1463, 91 L.Ed. 1757.

11. 29 U.S.C.A. § 201 et seq.

12. Walling v. American Needlecrafts, 6 Cir., 1943, 139 F.2d 60, 64; McComb v. Homeworkers' Handicraft Cooperative, 4 Cir., 1949, 176 F.2d 633.

13. Walling v. American Needlecrafts, supra, Note 12, 139 F.2d at page 63. See, United States v. Silk, supra, Note 10, loc. cit.; Stewart-Jordan Distributing Co. v. Tobin, 5 Cir., 1954, 210 F.2d 427, 432.

14. 15 U.S.C.A. § 45(a) (1).

15. 15 U.S.C.A. § 45(a) (6).

16. C. Howard Hunt Pen Co. v. Federal Trade Commission, 3 Cir., 1952, 197 F.2d 273, 281; and see, Federal Trade Commission v. Winsted Hosiery Co., 1922, 258 U.S. 483, 494, 42 S.Ct. 384, 66 L.Ed. 729.

Thus in one of the cases which arose in the Seventh Circuit the contention was made, *as it is made here,* that the concern involved had *no such* control over the persons participating in the sales plan as would make it liable for their acts. However, the Commission found that the testimony of customers, the representation made by the salespersons and the form of the credential cards, contracts and blanks on which the sales were made, were sufficient to hold the concern responsible as a principal. In sustaining this finding the court said:

"True, there was testimony by the so-called managers and representatives to the effect the business was being conducted by them independently and, that they received no orders or directions from the Art Company. There is evidence, however, including the physical facts, which demonstrate to the contrary. For instance, each salesman was issued a certificate designating him as the representative of the Art Company; the order was taken in its name; the picture was shipped in its name, and the customer was notified in its name of the time of delivery. All blanks used by the salesmen were furnished by the Art Company and bore its name. The customer had a right to believe—in fact, could not have believed otherwise, than that the salesmen *were the agents of the Art Company, with full authority in the matter.*

"Petitioners' argument and authorities are largely concerned with the relation between a manufacturer and a retail merchant. * * * It is also sought to compare the instant situation with the relation existing between the automobile manufacturer and its local agent. This is another instance, however, of the agency conducting its business in its own right and in an independent manner. These illustrations have no analogy to the present situation. Here, the agent was clothed with apparent and, we think, real authority to speak and act for and on behalf of the principal, and the latter is bound thereby. *We know of no theory of law by which the company could hold out to the public these salesmen as its representatives, reap the fruits from their acts and doings without incurring such liabilities as attach thereto.*"[17] (Emphasis added.)

Thus the courts take the view that the principal is bound by the acts of the salesperson he chooses to employ, if within the actual or apparent scope of his authority, even *when unauthorized.* As said by the Court of Appeals for the Second Circuit:

"But however unauthorized the offending conduct of the salesmen may have been and however condemned and discouraged by their superiors, it still was conduct which subjects the employers to the jurisdiction of the Commission and to its cease and desist order."[18]

In a later case the same court, in dealing with misrepresentations in conjunction with the sale of books, held the principal responsible because the salesmen *were his authorized agents.* This, despite the fact that the Commission found that the misrepresentations were made in *violation of direct instructions.* The Court summed up the matter in these words:

"They were nevertheless the authorized agents of the corporate petitioners, * * * to sell the books. The misrepresentations they made *were at least within the apparent scope of their authority and part of the inducement by which were made sales that inured to the*

17. International Art Co. v. Federal Trade Commission, 7 Cir., 1940; 109 F.2d 393, 396. And see, Consumer Sales Corp. v. Federal Trade Commission, 2 Cir., 1952, 198 F.2d 404, 406–407.

18. Parke, Austin & Lipscomb, Inc. v. Federal Trade Commission, 2 Cir., 1944, 142 F.2d 437, 440.

*benefit of the corporate petitioner.* Unsuccessful efforts by the principal to prevent such misrepresentations by agents will not put the principal beyond the reach of the Federal Trade Commission Act." [19] (Emphasis added.)

In the case before us the petitioner himself, in his testimony, states that the weavers' course was sold almost entirely through salesmen all over the United States and Canada. The salesmen who, at times, numbered as many as eighty, were secured through advertisements in national trade and specialty magazines. They were supplied with a sales kit paid for by them. *They were not trained to teach the course, but to sell it.* They were furnished with credentials showing them to be representatives of the petitioner. The course was prepared and mailed by the petitioner and the contract of purchase of the course was made with the petitioner by the salesmen. So, regardless of the manner in which these salespersons may have been designated in contracts between them and the petitioner or were carried on his books, so far as the public was concerned, they were his authorized agents and acted not only within the apparent but also within the actual scope of their authority. And the Commission was right in holding him responsible for their acts.

## IV.

### Cessation of Business.

Before discussing specific objections to the findings, we dispose of the contention that the petitioner *is no longer* engaged in the business and, that, for this reason, the Order to Cease and Desist should be set aside and no order for its enforcement be issued by this Court.

At the first hearing the petitioner, while stating that for reasons of health, his operations have been suspended, added that "he might want to resume the business under another set-up." At the final hearing, he testified that he had sold the assets to a corporation named Weavers' Guild, Inc., which took over the salesmen and the materials used in making the sales as of December 31, 1953. The incorporators were the petitioner's daughter, her husband and a former employee. The petitioner receives a royalty for the use of the course. He has stated that he continues to act in an advisory capacity "at any time they want me". A letter dated April 20, 1954, was admittedly signed with his name as "Director" and was sent by his direction by an employee of the corporation.

Instances exist where courts have modified cease and desist orders directed against corporations which had been dissolved under state law and were no longer in business.[20] Nevertheless, as one of the aims of the statute is to prevent unfair and deceptive practices, orders will be sustained even when it is clearly shown that the practices have actually been abandoned.[21] The cogent and obvious reason is that there is no guarantee that the practice *might not* be resumed.[22]

In accord with these cases, this Court has approved the inclusion of an officer of a corporation in such an order

19. Standard Distributors v. Federal Trade Commission, 2 Cir., 1954, 211 F.2d 7, 13.

20. Galter v. Federal Trade Commission, 7 Cir., 1951, 186 F.2d 810, 815–816.

21. Federal Trade Commission v. Goodyear Tire & Rubber Co., 1938, 304 U.S. 257, 260, 58 S.Ct. 863, 82 L.Ed. 1326. See, National Labor Relations Board v. Mexia Textile Mills, 1950, 339 U.S. 563, 567, 70 S.Ct. 833, 94 L.Ed. 1067.

22. Perma-Maid Co. v. Federal Trade Commission, 6 Cir., 1941, 121 F.2d 282, 284–285; Standard Container Mfrs' Ass'n v. Federal Trade Commission, 5 Cir., 1941, 119 F.2d 262, 265; Philip P. Park, Inc. v. Federal Trade Commission, 9 Cir., 1943, 136 F.2d 428, 430; Consolidated Royal Chemical Corp. v. Federal Trade Commission, 7 Cir., 1951, 191 F.2d 896, 900; Oregon-Washington Plywood Co. v. Federal Trade Commission, 9 Cir., 1952, 194 F.2d 48, 50–51; C. Howard Hunt Pen Co. v. Federal Trade Commission, 3 Cir., 1952, 197 F.2d 273, 281; Standard Distributors, Inc. v. Federal Trade Commission, 2 Cir., 1954, 211 F.2d 7, 14–16.

**594**

when necessary to make it fully effective in preventing the practices it found illegal.[23]

And courts, generally, will sustain orders directed against the persons who manage and control a corporate body in order to *prevent resumption* of unlawful practices.[24] This accords with the general attitude of the courts to respect the judgment of regulatory agencies as to the scope of an order if it appears that it could reasonably have concluded that the order was necessary.[25]

█ In view of the facts recited, the Commission was within its authority in concluding that the change in the relationship was more apparent than real and that too much reliance should not be placed on a promise of discontinuance of activities or participation in them by the petitioner.

### V.

### The Challenge to the Findings.

█ In considering the challenge to the Findings, we state generally that a study of the record leads to the conclusion that there is substantial evidence in it, considered as a whole, to sustain them all,[26] in accordance with the standards which the Supreme Court has laid down.[27] We speak of these Findings as the Findings of the Commission. In reality, they were the Findings of the Hearing Examiner which the Commission, on appeal, adopted as their own, with one exception.

In what follows, we shall review some of the evidence relating to the Findings under attack.

*A. The Use of the Word "Guild".*

█ We begin with the finding as to the name because the use of the name "Weavers' Guild" is characteristic of the entire pattern of the business conducted by the petitioner. Its use since early in 1952 is deceptive. It conveyed the impression that it is a "national" organization, the importance of membership in which should be emphasized by salesmen to persons to whom they sought to sell the course of instruction, and who were to be impressed with the fact that they were needed to fulfill a "national" program. Webster's Unabridged Dictionary, 1934, gives the following as the *first* definition of "guild":

"An association of men belonging to the same class or engaged in kindred pursuits, or with common interests or aims, formed for mutual aid and protection."

The legal definition is, in substance, the same.[28] They both refer to a non-profit association of persons engaged in the same craft for mutual assistance. The public has become familiar, in recent years, with the activities of the Newspaper Guild and of the various artists' guilds.

23. Tractor Training Service v. Federal Trade Commission, 9 Cir., 1955, 227 F.2d 420, 425.

24. Marlene's v. Federal Trade Commission, 7 Cir., 1954, 216 F.2d 556, 559-560.

25. May Dept. Stores Co. v. National Labor Relations Board, 1945, 326 U.S. 376, 390, 66 S.Ct. 203, 90 L.Ed. 145; and see, Federal Trade Commission v. National Lead Co., 1956, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438.

26. 5 U.S.C.A. § 1009(e).

27. Corn Products Refining Co. v. Federal Trade Commission, 1945, 324 U.S. 726, 739, 65 S.Ct. 961, 89 L.Ed. 1320; Federal Trade Commission v. A. E. Staley Mfg. Co., 1945, 324 U.S. 746, 760, 65 S.Ct. 971, 89 L.Ed. 1338; Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 490-491, 71 S.Ct. 456, 95 L.Ed. 456; O'Leary v. Brown-Pacific-Maxon, Inc., 1951, 340 U.S. 504, 508-509, 71 S.Ct. 470, 95 L.Ed. 483.

28. Black's Law Dictionary, 1951, "guild", p. 835. A more comprehensive definition is:
"a voluntary association of persons pursuing the same trade, art, profession, or business, such as printers, goldsmiths, wool merchants, etc., united under a distinct organization of their own, analogous to that of a corporation, regulating the affairs of their trade or business by their own laws and rules, and aiming, by coöperation and organization, to protect and promote the interests of their common vocation." 38 C.J.S. Gild and Guild **p. 924.**

Courts have uniformly sustained Orders of the Federal Trade Commission prohibiting the use of misleading designations. Thus, a flour company was prohibited from using the word "milling" in its title, because the word was understood by dealers and the purchasing public to indicate concerns which grind wheat into flour, which the particular mill did not do.[29] This Court sustained an Order forbidding, in advertising a medicated douche powder, the use of the word "MD" because the purchasers would mistake it for an abbreviation of Doctor of Medicine, and imply medical approval. The Court said:

> "Above and beyond the oral evidence in this case—evidence which, we repeat, is both substantial and impressive—stands the mute and accusing testimony of the thing itself. We have examined the advertising matter and the container put out for the petitioners' douche powder. Like the Commission, we too have noticed that blatant emphasis on the letters 'MD'. We too have discerned the attempt—and, we believe, the conscious attempt—to capitalize upon the prestige of a profession that, for all its blunders and ineptitudes, from the very days of Hippocrates and Galen has built up a noble tradition of selfsacrifice and service to humanity.

> "We agree with the conclusion of the respondent that the use of the letters 'MD' is deceptive."[30]

In another case this Court forbade the use of the word "Hollywood" with the legend "favorite of the stars" in conjunction with a cosmetic preparation upon the ground that it gave the impression that it was a product of Hollywood's theatrical colony and was preferred by the motion picture stars.[31] And generally courts will sustain the acts of the Federal Trade Commission in prohibiting the use of a trade-name that might cause confusion, whether the name used is that of a competitor or not.[32]

The case before us was a proper one in which to apply the principles of these cases. No Weavers' Guild of America ever existed. The purchasers derived no benefit from it. It was merely a fictitious name under which the petitioner was doing business and its use was likely to mislead.

**B. Representations as to Earnings.**

The Commission found that earnings of $1,452 in eleven days, $1,368 in seven days and $1,302 in ten days *are not typical* earnings of salesmen selling the petitioner's course. One of the exhibits in the record which the petitioner admitted that he disseminated, contained, among other things, the following statement:

Meet a few of our salesmen.

Below it were photographs of three persons, G. Worthingham, whose earnings for eleven days were listed as $1452, W. H. Orledge, whose earnings for seven days were listed as $1368 and S. Buda, whose earnings for ten days were $1302. Under each photograph topping the listing of the dates on which the various amounts which comprised the total were made, was the legend *"Typical earnings with us"*. The vice of the advertisement lay in the fact that these earnings were, *in no way, typical*. They were exceptional. For they represented persons who had devoted *much time* and *were assisted* by others in selling the course. And the petitioner testified that he "would consider a man a very good man

---

29. Federal Trade Commission v. Royal Milling Co., 1933, 288 U.S. 212, 53 S.Ct. 335, 77 L.Ed. 706.

30. Stanley Laboratories v. Federal Trade Commission, 9 Cir., 1943, 138 F.2d 388, 393.

31. Howe v. Federal Trade Commission, 9 Cir., 1945, 148 F.2d 561.

32. American Air Lines v. North American Air Lines, 1956, 351 U.S. 79, 85–86, 76 S.Ct. 600, 100 L.Ed. 953, and cases there cited. This is in accord with the principle that *"Injury to competition need not be shown."* Koch v. Federal Trade Commission, 6 Cir., 1953, 206 F.2d 311, 319. (Emphasis added.)

if he made one sale a day". For that he would receive $22.50. The sales price was $35. And the payment of a commission of $22.50 of this price is, by itself, of the character to induce salesmen to resort to questionable practices, which it is the duty of the Commission to prohibit.

So the Commission was justified in enjoining the representation that the *typical* earnings of persons selling the petitioner's course of instruction are greater than they actually are in fact.

C. *Representation as to Materials to be Furnished to Salesmen.*

 The Commission found that the petitioner *did not* furnish to sales agents the names of prospective purchasers, or with everything necessary in selecting and closing sales. The advertisement already referred to contains this statement:

"You buy Nothing—you demonstrate Nothing. We furnish everything from tested, proven sales talk to order closing sales kit. For full facts and proof—write quick, today, to Weavers Guild, Dept. 0–3, 4634 Hollywood Blvd., Hollywood 27, California."

Another advertisement contains the phrase in bold face:

**You Work on Qualified Leads.**

Still another repeated the statement:

"You don't demonstrate anything. You work from qualified leads."

In every-day parlance, "the furnishing of a lead" to a salesman implies *supplying* the names of persons who *might* become purchasers. When to the words is added the adjective "qualified" the inference becomes almost a promise of "good prospects". The petitioner in his first interrogation before the Commission, was asked:

"Q. Do you supply them (the salesmen) with the names of prospects or leads?"

and his answer was categorical:

"No, we do not. I will qualify that by saying once in a great while

we will get an inquiry of some kind and might refer it to the salesmen."

He also stated that salesmen were *required* to pay five dollars, *as a returnable deposit,* for the sales kit and that if they needed additional brochures to leave with the customers, they *would have* to pay for them.

So here again, there is substantial testimony to sustain the finding and the paragraph of the Order prohibiting such representation unless it is stated that the articles are furnished after the agents have made deposits or payments for them.

The foregoing three representations were alleged to have been made to salesmen to induce them to sell the course. We now come to the representations directed at the purchasers of the course of instruction.

D. *Representations as to the Nature of the Course.*

 The Commission found that the petitioner's course was not a complete course in *reweaving.* While the petitioner called his "Nu-Weaving", his brochures and advertisements describing the course used the word "re-weaving" in such a manner that it would be difficult for a person not knowing how to differentiate between the various types of weaving to know that the lessons *did not* relate to reweaving.

In one of the exhibits, below the title "Learn and Earn with Nu-Weaving", occurs the following language:

"The modern method of Invisible Re-Weaving"

In the same brochure it is written:

"We furnish everything you'll need to learn. To reweave you must know the 3 basic weaves of cloth."

And at the end, there is this statement:

"Reweavers earn as high as $100 a week."

The evidence before the Commission shows that *reweaving* is difficult to learn. For it involves the taking of threads identical to the yarn used in the cloth and weaving them into the threads that

are in the material itself. The method is known as "invisible reweaving" or "French reweaving".

Another method is what is known as "patch weaving". It is done with swatches of material. The swatch is placed on top of the material and the threads are pulled from each side and the threads are woven back into the weave of the material, pulled underneath and into the weave of the material so as to give the appearance of one continuous piece. This method is not so satisfactory as the French weaving because, as one witness stated, "the pattern is broken and is not perfect". This is also known as "over-lay".

The third method is known as "end weaving". This is done by placing a piece of cloth over the hole, threads are pulled underneath into the weave, so as to make the thread become a part of the material itself. What the petitioner called "Nu-Weaving" was this third method. It required the use of a special needle to draw the threads fringing the patch through the cloth, and to hook them to the back. It implied, as the petitioner himself testified at the final hearing, the use of a pattern

> "over the damaged part of the material and interweaving of the fringes of the patch with the undamaged portion of the material so that it appears to be continuous in pattern."

The representations so intermingled the words "reweaving" with the others that they conveyed the impression that the more difficult form of reweaving was being taught. The Commission was right in requiring the petitioner to desist from representing that his course of instruction constitutes a complete course in reweaving "unless and until such is in fact true".

### E. Representations as to the Ease in Learning the Craft.

 The Commission found that the representation that reweaving is learned and can be mastered easily and by many in ten days was incorrect. The experts produced by the Commission, to whose testimony we have already referred in the preceding paragraph, testified that *true reweaving* is a difficult course taking many months to learn. The petitioner himself, in his testimony, stated that true reweaving was difficult to learn. So, in the main, we are confronted with the fact that the basis for the objection of the petitioner to this and the preceding Finding is his contention that *he did not* advertise the difficult two types of reweaving discussed.

The short answer to this claim is that the word "reweaving" was so intermingled with the word "Nu-Weaving" that the prospective purchaser to whom, in alluring and blatant terms, it was held out as a craft easily learned and from which great remuneration could be expected, with little effort, might be led to believe that the difficult reweaving was being actually taught *in a few easy lessons*. So here again, the Commission was warranted in requiring that the petitioner confine his representation as to his course "to the overweaving or patch type" of reweaving.

### F. Representations as to Personal Instruction.

 The Commission found that, at times, sales agents made the representation that prospective students would be given personal assistance in completing the course, when, as a fact, no such assistance was provided as a *regular* part of the course. There is evidence in the record that at least two salesmen made such representation. In one of the circularized letters signed by the petitioner, salesmen are instructed to hold out to women these inducements,

> "Their present security lies in the continued employment and good health of the breadwinner. If something happens to him, a strike, layoff, injury or death, then security vanishes.

> "You'll agree that's something for her to think seriously about. Every woman realizes these things and

You Can Capitalize heavily on these ever present fears.

"Women want to 'express' themselves. They want to do creative, useful work. The Man Who Shows Them 'How' Will Be Welcome and Will Reap a Harvest. They only need someone to show them 'how'.

"If, in addition to that he opens up a Weavers Work Shop (*one of the three*) *opportunities open to everyone of my associates he can use the graduates to feather his own nest as employees in a permanent profitable business of his own.*

"*Nothing could be sweeter for You.* One hand washes the other in this deal and you get yours coming and going." (Emphasis added.)

And in the questionnaire to be analyzed more fully in the next subdivision, the petitioner speaks of "assistance" which the salesmen can give to graduates "in starting their own business". The petitioner's insistence that such promises were unauthorized is contradicted by these facts. For they show that what the salesmen told the prospective students was, *in the spirit, if not to the letter,* of what they were *encouraged,* indeed, *coached* by him to tell. More, even if they were not fully authorized, the Commission was exercising its preventive powers in ordering him to desist, in view of the fact that they were made by the salesmen within the apparent and real scope of their authority.[33]

G. *Representation as to Potential Earnings of Those Completing the Course.*

 The Commission found that the representation that $25 per week for spare time work and from $50 to $200 per week could be reasonably expected was not true. The circular letter referred to tells salesmen

"You pitch to housewives mainly; you can see them all day long; they are now earning exactly nothing.

They need only to be convinced that they can make as little as $15.00 a week in their spare time at home and they will buy."

The very alluring use of the words "*as little as*" is significant. In one of the advertisements the salesmen are advised:

"You can show them how to earn up to $5.00 an hour continuously at home, with invisible Nu-Weaving."

A circular addressed to the salesmen entitled "Questionnaire", is very revealing. It contained the following preamble:

"This is self-explanatory.

"It was composed through a compilation of all the usual questions which arose in the prospect's mind. Read them through several times and 'fix' the answers in your mind. *Thus, you will have them all at your finger tips.* Already, unhesitant answers to any questions generates a prospect's confidence in the salesmen. With this knowledge, your first 'pitch' should be as good as any that follows." (Emphasis added.)

The questions themselves bear the following heading:

We Know You Must Have Loads of Questions to Ask Us but We Have Been Asked So Many Questions About Nu-Weaving We Think We Can Anticipate Most of Yours—So Read These Questions and Answers.

The first six questions are a complete answer to the attempt of the petitioner to thrust upon his salesmen the sole responsibility for the representations with which we are dealing.

Here we have instructions which use the words "invisible repair", "invisible weaving" and "reweaving", indiscriminately and almost interchangeably, and statements urging salesmen to represent that it is "easy" to earn $25 a week in "spare time" and that many "full-time" re-weavers "earn as high as $200 per week."

33. See cases cited in Notes 16, 17, 18 and 19.

Because they disclose so thoroughly the manner in which the petitioner was "coaching" his salesmen, the questions are reproduced in their entirety:

"Q. 1 What is Nu-Weaving? Ans. Nu-Weaving is a new method of invisible repair to damaged cloth. Through the use of specially designed hand instruments and a newly created method of doing invisible weaving, the time required for repairs on most jobs is about ⅓ of the time needed heretofore by the old methods.

"Q. 2 What does all this mean to me? Ans. Because of this great saving in time, *operators are able to do this work at about ⅓ of the usual price and still earn as much per hour as operators using the old method.*

"Q. 3 How much money can I expect to earn? Ans. *If you work only spare time it is easy to earn $25.00 a week. Many full time reweavers earn as high as $200 a week.*

"Q. 4 In just what way does this make Nu-Weaving an attractive trade? Ans. Because, while only a small 5% of the public could afford the old, expensive methods, Now— Through Fast Nu-Weaving, this type of repair fits everyone's pocketbook; thus, a much greater field for this work is open and a much greater need exists for competent Nu-Weavers.

"Q. 5 *Why haven't there been more invisible weavers in the past?* Ans. *Due to the long time necessary to teach the old way of doing invisible weaving, those 'in the know' have usually been reluctant to impart their knowledge to more than a limited number of apprentices.*

"Q. 6 How long does it take to become competent? Ans. Many students trained have completed

their course in a period of *two to three weeks.*" (Emphasis added.)

In another of the advertisements of the course the statement is made:

"Reweavers earn as high as $100 per week."

There is testimony in the record that it was not possible to earn that amount, unless the person devoted all her time and had established a custom that would bring in work enough to produce such earnings. It certainly could not be obtained through cleaners and dyers who, in the same questionnaire, were declared to be the main source of custom and profit for the graduates of the course. Question 15 and the Answer to it read:

"What assistance do you give graduates in starting their own business? Ans. The main source of Invisible Reweaving are cleaners, upholsterers and insurance companies. If you will submit a list of not more than 20 such business concerns, we will contact them with advertising material and attempt to arrange for you to leave samples of your work for display. You will find them eager for the most part to give you their full co-operation. The lower price schedule; 3 days delivery and excellence of work is sufficient to encourage them to become Nu-Weaving agencies."

Operators of commercial weaving establishments testified that employees skilled in all types of reweaving could not earn the amounts which were held out as easy possibilities to the graduates of this course in a very limited type of weaving. These misrepresentations were of the type which courts have condemned repeatedly.[34] The Commission was fully justified in ordering the petitioner to desist from representing that the potential earnings of those purchasing and completing his course and engaging in re-weaving are greater than they are in fact.

34. Tractor Training Service v. Federal Trade Commission, 9 Cir., 1955, 227 F.2d 420.

Of a similar Order this Court has stated:

"It does not preclude all future representations by petitioners of the earning experience of their graduates. It does preclude representations that petitioners' graduates earn wages in excess of the average net earnings which they actually receive. In short, the order says no more than that future representations by petitioners must have a basis of fact. The order is clear and definite and within the discretion delegated by Congress to the Commission to prescribe appropriate remedies." [35]

### H. Representation as to Cost of Materials.

■ The Commission found that the representation that materials supplied with the course are worth $30 was false. Admittedly, they were not worth such amount. Replacements were sold for $1.00. In a brochure entitled "Sales Ideas on Nu-Weaving" copyrighted by the petitioner in 1952, is found the following:

"Sales Pitch in Nu-Weaving"
In following leads, the salesman is instructed with relation to the price:

"To impress them with the value of a set of needles, say, 'One can't put a price on these because we never sell them. We won't sell them to anyone. They go only with our course. But one firm, as you see here, sells a set of similar needles for $27.50.'"

This was palpably false. The needles referred to were of a different character and were hand-made. And the Commission was justified in assuming that the representation was not limited to the period when, as claimed, needles were scarce and in preventing recurrence by prohibiting the representation that the needles were worth more than the petitioner ordinarily charged for them.

### I. Promise of Refund.

■ The Commission found that representations were made that the petitioner would make full refund of moneys paid on the contracts if the purchasers were unable to complete the course. There is evidence in the record that such representations were made and that the petitioner refused such refunds when demanded. There is a letter signed by the petitioner as "Director" of Weavers Guild on April 20, 1954, *at a time when, as he now contends, he was no longer connected with the business,* addressed to the Better Business Bureau of Los Angeles, who had evidently sought the cancellation of the contract of a dissatisfied purchaser from Waterbury, Connecticut, in which he states:

"There were no special circumstances in this case to make us desist from our usual policy of noncancellable enrollments, which was clearly printed on the order form signed by Mrs. Hine."

5. Tractor Training Service v. Federal Trade Commission, supra, Note 34, 227 F.2d at page 425. Of the type of advertising here involved and its capacity to deceive the public, the Court of Appeals for the Seventh Circuit has stated: "The important question to be resolved is the impression given by an advertisement as a whole. Advertisements which are capable of two meanings, one of which is false, are misleading. * * * Advertisements which create a false impression, although literally true, may be prohibited. * * * "The meaning of advertisements to the public and their capacity to deceive are questions of fact for the Commission to determine, and its conclusions may not be disturbed unless arbitrary or clearly wrong. * * * Applicable here is our statement in Zenith Radio Corp. v. Federal Trade Commission, 7 Cir., 143 F.2d 29, 31, 'The Commission had a right to look at the advertisements in question, consider the relevant evidence in the record that would aid it in interpreting the advertisements, and then decide for itself whether the practices engaged in by the petitioner were unfair or deceptive, as charged in the complaint.'" Rhodes Pharmacal Co. v. Federal Trade Commission, 7 Cir., 1953, 208 F.2d 382, 387.

Granted that these representations may have been made in derogation of the terms of the written contract and that they were unauthorized or condemned after they occurred, the Commission, in view of the entire pattern of the venture, was authorized in holding the petitioner responsible for them and in ordering that no such representations be made in the future unless refunds are actually made upon demand by the purchaser.

*J. Representations as to Approval of the Course for Veterans' Training.*

The Examiner found that there was *no evidence* that petitioner's correspondence course was represented to prospective purchasers as having been approved for training by the Bureau of Education of the State of California and the United States Veterans' Administration. On appeal, the Commission disapproved the finding and instead of it substituted the following:

> "The Commission finds that the respondent has falsely represented that his course of instruction has been approved for training by the Bureau of Education of the State of California and the United States Veterans Administration."

The petitioner insists that the Examiner was correct and that the evidence supports his conclusion and not that of the Commission.

The Findings of the Examiner are entitled to weight and consideration by the Commission. But there is no mandate that it accept them. The reviewing court should

> "accord the findings of the trial examiner the relevance that they reasonably command in answering the comprehensive question whether the evidence supporting the Board's order is substantial." [36]

We are of the view that the Commission properly rejected this Finding of the Examiner. In considering the evidence in this case, *the pattern and frame-work of the whole enterprise must be taken into consideration.*

The representations already discussed and the implications they carried are of the very type most likely to deceive.[37] In the petitioner's instructions to the salesmen, in telling them what line or "pitch" to use, fact and fancy, past and present activities are so intermingled that the salesmen were justified in applying to the present course official approval of a resident course formerly taught by the petitioner.

In forwarding the material as to the approval of that course by the Bureau of Education of the State of California and the United States Veterans Administration, instructions were given to refer to the fact in selling the present course. But nowhere was the dissimilarity between the two courses pointed out. The rider which accompanied the materials relating to the approval was equivocal. It read:

> "The V. A. and State Approvals
> "It is easy to get a letter of recommendation but it is something else when a public body actually sends their 'charges' to you for instructions and Pays the tuition fee.
>
> "You can imagine with what keen study they scrutinize our operations, what an acid test they used to evaluate the worth of our course.
>
> "These photostats are Cynamite. If used effectively, think what confidence it must generate in your prospect. There are very many deals that would give their right eye to have a wallop like this in their kits. All right. You've got it—*Use*

36. Universal Camera Corp. v. National Labor Relations Board, supra, Note 27, 340 U.S. at page 497, 71 S.Ct. at page 469, 95 L.Ed. 456.

37. Stanley Laboratories v. Federal Trade Commission, supra, Note 30; Charles of the Ritz Distributors Corp. v. Federal Trade Commission, 2 Cir., 1944, 143 F. 2d 676, 680; Koch v. Federal Trade Commission, 6 Cir., 1953, 206 F.2d 311, 319; Reddi-Spred Corp. v. Federal Trade Commission, 3 Cir., 229 F.2d 557.

**602**

*it—Use it effectively—Use it to engender confidence."*

And there is a letter addressed to one of the prospective salesmen under the date of January 28, 1952, which states:

"The fact that our course was accepted and successfully used in the training of G.I.s is certainly one of the highest recommendations we could submit."

The home study course was never so approved. One of the objects of the Federal Trade Commission Act is to eradicate business methods *having a capacity to deceive.*[38] This accords with the policy of the Act to stop unfair methods of competition in their inception.[39] In the light of these objectives, the facts just referred to warranted the Commission in making a Finding contrary to that of the Examiner and adding to the Order a provision commanding the petitioner to desist from representing that his course of instruction had been approved for training by the Bureau of Education of the State of California or the United States Veterans Administration.

### Summary and Conclusion.

In what precedes we have considered the objections, legal and factual, urged against the Order of the Commission. This has required the examination of a very voluminous record. No attempt has been made to summarize all the evidence relating to each of the facts bearing upon the specific Findings under attack. Some only were given but all facts relating to a particular subject appearing in the record, favorable or unfavorable to the particular findings, were considered, in obedience to the mandate to determine the correctness of the Conclusions on the factual issues before the Commission on the record as a whole.[40]

Much is made in the argument of the fact that a large portion of the practices found by the Commission to exist related to one region—the New Orleans Region. But they are not confined entirely to that area. The advertisements were published in trade magazines of national circulation and the various circulars to salesmen had wide, interstate distribution.

More, it is quite customary to find a particular territory fertile ground for the type of shrewd misrepresentation and equivocal advertising with which the record in this case is replete. The Commission by taking action when these practices are called to its attention, prevents their spread elsewhere, which is in true keeping with the object of the Commission to cause the discontinuance of unfair and receptive practices at their inception. And courts, on review, may infer the existence of practices other than those proved.[41]

**38.** Federal Trade Commission v. Algoma Lumber Co., 1934, 291 U.S. 67, 81, 54 S.Ct. 315, 78 L.Ed. 655; Charles of the Ritz Distributors Corp. v. Federal Trade Commission, supra, Note 37.

**39.** Federal Trade Commission v. Raladam Co., 1942, 316 U.S. 149, 152, 62 S.Ct. 966, 86 L.Ed. 1336; and see, Federal Trade Commission v. Raladam Co., 1931, 283 U.S. 643, 647, 51 S.Ct. 587, 75 L.Ed. 1324.

**40.** 5 U.S.C.A. § 1009(e).

**41.** As said of a similar contention that the number of persons deceived was small:
"The contention is made that there is no evidence to support the Commission's finding that a substantial portion of the public was induced to purchase petitioner's merchandise on the strength of these false representations, and therefore the Commission's action was not in the public interest. The argument is based on the: *de minimus* concept: only fourteen housewives testified before the Commission although thousands of sales were made. *We are not persuaded by this reasoning, however. There is no indication that these were the only housewives to whom false representations were made.* On the contrary, the evidence shows that all salesmen carried order blanks marked 'Special Offer', and the brown envelopes were distributed to all buyers indicating that these fourteen witnesses were but a few of the many deceived. Substantial amounts of merchandise having been sold by false and misleading representations, the interest of the public in the proceeding was well

One other observation is in order. It is argued earnestly that some of the representations, such as those relating to the character of the course, and the ease with which it may be learned, are nothing more than the "puffing" which is tolerated in modern commerce and may, in certain instances, be considered innocuous even in cases under the Federal Trade Commission Act. However, an examination of the cases referred to as countenancing this shows that in the particular instances, the "superlative" words were used in a context which negatived the idea that they were "calculated to deceive". In one of the cases cited, the Court remarked upon the characterization of a product as a "perfect" lubrication:

"So far as we know, there is nothing 'perfect' in this world, but still it is a common term, which undoubtedly means nothing more than that the product is good or of high quality. *We can conceive of situations where the use of such words might be deceptive and even fraudulent.*"[42] (Emphasis added.)

In another cited case, the use of superlatives in an advertisement relating to a modern course in reducing was held, in the circumstances, to contain "nothing deceptive."[43] However, this is not the situation here. Here, we have statements made to salesmen with the intention that *they be conveyed* by them to prospective purchasers and which *are aimed* to induce the purchase of a course of study. As to a similar situation, *the same court* which decided the two cases just referred to, said:

"Neither are we impressed with the suggestion that representations relied upon can be excused on the basis that they are only 'puffing', as that expression is sometimes used. It seems plain that the representations were made in order to induce the purchase of petitioners' products, and those contained in printed matter as well as the false statements by the salesmen were made with that end in view. *Statements made for the purpose of deceiving prospective purchasers and particularly those designed to consummate the sale of products by fright cannot properly be characterized as mere 'puffing'.*"[44] (Emphasis added.)

It should be added that we are not in the realm of civil torts. Even in that realm the old rule of *caveat emptor* has been abandoned, in favor of the more ethical attitude that one dealing with another in business had the right to rely upon representations of facts as the truth.[45] And the Supreme Court has applied with great consistency this approach in dealing with the Federal Trade Commission by stating, in a leading case:

"The fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. *Laws are made to protect the trusting as well as the suspicious.* The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of *caveat emptor* should not be relied upon to reward fraud and deception."[46] (Emphasis added.)

established." Consumer Sales Corp. v. Federal Trade Commission, supra, Note 17, 198 F.2d at page 407. (Emphasis added.)
And see cases cited in Note 37.

42. Kidder Oil Co. v. Federal Trade Commission, 7 Cir., 1941, 117 F.2d 892, 901.

43. Carlay Co. v. Federal Trade Commission, 7 Cir., 1946, 153 F.2d 493, 496.

44. Steelco Stainless Steel, Inc. v. Federal Trade Commission, 7 Cir., 1951, 187 F.2d 693, 697.

45. Byrnes v. Mutual Life Ins. Co. of N. Y., 9 Cir., 1954, 217 F.2d 497, 502.

46. Federal Trade Commission v. Standard Education Society, 1937, 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141. In a later case, Mr. Justice Black summed

In sum, *capacity to deceive and not actual deception* is the criterion by which practices are tested under the Federal Trade Commission Act. The record in this case shows a series of acts which were calculated to deceive, some practiced directly by the petitioner, others by salesmen encouraged by him to practice them and for which he should be held responsible, because done within the actual and apparent scope of their authority.

The Order of the Commission is affirmed.

See also 135 F.Supp. 376.

up the present day attitude in this manner:

"That exceptionally acute and sophisticated readers might have been able by penetrating analysis to have deciphered the true nature of the contest's terms is not sufficient to bar findings of fraud by a fact-finding tribunal. *Questions of fraud may be determined in the light of the effect advertisements would most probably produce on ordinary minds."* Donaldson, Postmaster General v. Read Magazine, Inc., 1948, 333 U.S. 178, 189, 68 S.Ct. 591, 597, 92 L.Ed. 628. (Emphasis added.)

And see, Charles of the Ritz, etc. v. Federal Trade Commission, supra, Note 38, 143 F.2d at page 680, and cases cited in Note 37 of this opinion.