**P. F. COLLIER & SON CORPORATION, P. F. Collier, Inc., and Crowell Collier & MacMillan, Inc., Petitioners,**

v.

**FEDERAL TRADE COMMISSION,**

Respondent.

No. 19549.

United States Court of Appeals, Sixth Circuit.

May 27, 1970.

Thomas S. Markey, Washington, D. C., Whitlock, Markey & Tait, Washington, D. C., on the brief; Austin J. Farrell, Senior Counsel, Crowell, Collier & MacMillan, Inc., New York City, of counsel, for petitioners.

James P. Timony, Federal Trade Commission, Washington, D. C., John V. Buffington, General Counsel, J. B. Truly, Asst. General Counsel, Alvin L. Berman, Atty., Federal Trade Commission, Washington, D. C., on the brief, for respondent.

Before WEICK, EDWARDS, and CELEBREZZE, Circuit Judges.

CELEBREZZE, Circuit Judge.

This cause is before the Court on the petition of Crowell Collier and MacMillan, Inc. [hereinafter "Crowell Collier"] and two of its subsidiaries, P.F. Collier and Son Corporation [alternatively referred to as "Collier & Son" and "P.F. Collier & Son Corp. [#2]"] and P.F. Collier, Inc. [hereinafter "Collier, Inc."], to review an order of the Federal Trade Com-

mission requiring the petitioners to cease and desist from certain unfair and deceptive trade practices allegedly employed in the door-to-door sales of Collier Encyclopedias.

I.

*Statement of the Facts and the Proceedings Below.*

On January 18, 1960, the Commission issued an administrative complaint against Crowell Collier, a holding company, and its wholly-owned subsidiary, Collier & Son, charging that the latter had used unfair and deceptive methods in the door-to-door sales of encyclopedias in violation of Section 5 of the Federal Trade Commission Act.[1] Beginning in August, 1960, hearings were held before a trial examiner. On December 30, 1960, Collier & Son was merged into Crowell Collier; on December 22, 1960, Collier Inc. was formed to take over the business of selling encyclopedias from Collier & Son.[2] Nearly five years later, on September 3, 1965, the trial examiner rendered an initial decision in which he found that: Crowell Collier was not subject to an order because it was not engaged in interstate commerce; Crowell Collier had not so dominated and controlled the management of Collier & Son that the corporate identity of the latter could be ignored, that is, the parent could not be held derivatively responsible for the acts of its subsidiary; Collier & Son was not subject to an order because Federal Trade Commission orders operate prospectively, and to subject a dissolved corporation to such an order would be a "useless act"; insofar as most of the evidence adduced at the hearings involved illegal practices occurring between 1955 and 1960, the staleness of the evidence warranted a determination that it

---

1. The pertinent provisions of the statute are:

 Sec. 5(a) (1). "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." 15 U.S.C. § 45(a) (1) (1964).

 Sec. 5(a) (6). "The Commission is empowered and directed to prevent per-

sons, partnerships, or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." 15 U.S.C. § 45(a) (6) (1964).

2. For reasons which remain obscure, the Commission never amended its complaint to include Collier, Inc.

was "not in the interest of the public" to give further life to the proceeding. In view of these findings, the examiner made no findings with regard to the substantive violations of the Act alleged in the complaint, which he dismissed.

On appeal, with two commissioners dissenting,[3] the Commission vacated the initial order of the trial examiner. It made extensive findings of substantive violations of the Act by Collier & Son and, on September 30, 1966, it issued a cease and desist order enjoining "P.F. Collier & Son Corporation under this or any other name, its successor or assign * * *" from committing further violations. The Commission then abated this order pending a "limited" remand to a trial examiner for further findings on the following issues *"inter alia"*: Whether a "successor" of Collier & Son existed against which the cease and desist order could be enforced; whether the parent (Crowell Collier) in fact so dominated and controlled the management of its subsidiaries (Collier & Son and Collier, Inc.) that it should also be subjected to the order.

3. Commissioner · MacIntyre dissented on the grounds that the proceedings had been so unduly protracted as to deny the petitioners due process of law, and that the Commission had sufficient evidence before it to dispose of the issues for which it remanded the case for a second hearing. Commissioner Elman dissented without opinion. The opinions of the Commission and of Commissioner MacIntyre are reproduced at Par. 17,748 CCH Trade Reg.Rep. (Transfer Binder 1967).

4. The petitioner's allegations of error regarding the legality of the remand proceedings were saved for this appeal, and shall be considered below.

5. The second hearing examiner's January 4, 1968 order is noted in CCH Trade Reg. Rep., Par. 18,158 (1968).

6. Commissioner Elman did not concur in the Commission's order. The order and opinion of the Commission are reproduced in CCH Trade Reg.Rep., Par. 18,684 (1969).

The September 30, 1966 order, which was reinstated on February 4, 1969, provided:

Notwithstanding the petitioners' vigorous protestations that the remand proceedings were illegal, hearings were held before a second trial examiner, the first examiner having passed away prior to the Commission's order.[4] In addition to accepting fresh evidence of "successorship" and "domination," the new examiner also accepted extensive testimony and exhibits tending to show that Collier, Inc. had perpetuated the deceptive sales practices of Collier & Son. On January 4, 1968, the hearing examiner released his lengthy decision in which he concluded that Crowell Collier so dominated and controlled the acts of Collier & Son that the corporate identity of the latter was "a mere fiction"; that Collier, Inc. was indeed a successor to Collier & Son; that Collier, Inc. had employed the same unfair and deceptive sales methods as had Collier & Son before it.[5]

On February 4, 1969, the Commission adopted the findings and conclusions of the second examiner, and reinstated the order it originally issued on September 30, 1966.[6] It is that order and the pro-

"IT IS ORDERED that respondent P. F. Collier & Son Corporation under this or any other name, its successor or assign and officers, agents, representatives, salesmen, and employees, directly or indirectly, through any corporate or other device, in connection with the publication and direct or door-to-door sale and distribution of encyclopedias, books, publications or other merchandise, in commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from:
"1. Representing, directly or indirectly, that:
a. Respondent's representative making the call is conducting a survey of any kind, is engaged in a brand identification program, is connected with respondent's advertising, promotion, publicity, education or any department other than sales, is calling on a special list of people or is not selling anything;
b. Respondent is offering encyclopedias or other books or articles, alone or in combination, free of any cost or charge or at a reduced price (1) in return for a letter from the purchaser with his

ceedings giving rise to it that are now under review.

There are essentially three sets of issues on this appeal: *First*, issues involving the lawfulness and sufficiency of the Commission's substantive findings; second, issues involving the nature of the proceedings below and the interest of the public; third, the issue of the lawfulness and propriety of the Commission's order. We shall present and discuss the issues in that sequence.

## II.

A. *Whether the Commission's finding that Crowell Collier dominated and controlled the operation of Collier & Son, and should thereby be subject to the order to cease and desist, is supported by substantial evidence and in accordance with law.*

 or her opinion about the encyclopedia and permission to use the purchaser's name or (2) on the condition of the purchase of the yearly supplement or any other book or article;

c. Respondent, under any circumstances, is offering encyclopedias, alone or in combination, free of any cost or without charge or obligation;

d. The offer of respondent's encyclopedia is a "special introductory offer" or that any offer is limited in point of time or in any manner;

e. The offer of the encyclopedia or any other book or article (1) is being made to a specially selected group of people or (2) is not being offered to the public generally at the time of the call of the representative or (3) is made in advance of the general sales promotion of the item which will be conducted at a later date;

f. Respondent's annual supplement or year book usually and regularly sells for $10.00 or any amount in excess of the price usually and regularly charged for the book;

g. The encyclopedia offered to the prospective customer is nationally advertised for $389 or any sum of money which is in excess of the price at which respondent's encyclopedia of the same grade and quality as that shown to the pros-

The general rule is that, absent highly unusual circumstances, the corporate entity will not be disregarded. *See* H. G. Henn, Corporations 204–205 (1961); W. M. Fletcher, Cyclopedia of the Law of Corporations §§ 41–46 (rev. ed. 1963). However, it is well established that where stock ownership is resorted to for the purpose of controlling a subsidiary so that it may be used as "a mere agency or instrumentality" of the parent

"the courts will not permit themselves to be blinded or deceived by mere forms or [sic] law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." Chicago, Milwaukee & St. Paul Railway Company v. Minneapolis Civic and Commerce Association, 247 U.S. 490,

 pect is regularly sold to the purchasing public at such time;

h. The cost of respondent's encyclopedia, book, publication or other article of merchandise may be paid for over a 10-year period or other specified period of time when such time is in excess of the period of time in which respondent will accept deferred payments.

"2. Misrepresenting:

a. The prices of or the savings available to members of the public or to purchasers of respondent's merchandise by means of comparative prices or in any other manner;

b. The employment status of respondent's salesmen or representatives; or

c. The nature of, or the conditions connected with, the offer of merchandise made to members of the public or to purchasers.

"3. Failing to disclose at the time admission is sought into the home, office or other establishment of the prospective purchaser or purchasers that the person making the call is respondent's salesman and is soliciting the sale of respondent's merchandise.

"4. Using any plan, scheme or ruse as a door-opener to gain admission into a prospect's home, office or other establishment, which misrepresents the true status and mission of the person making the call. * * * *"

501, 38 S.Ct. 553, 557, 62 L.Ed. 1229 (1918).

North American Company v. Securities Exchange Commission, 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945 (1946); National Labor Relations Board v. Deena Artware, Inc., 361 U.S. 398, 403, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960), citing opinion of Cardozo, J. in Berkey v. Third Avenue Railway Company, 244 N.Y. 84, 94–95, 155 N.E. 58, 61, 50 A.L.R. 599, 604–605 (1926). *See* Stevens on Corporations §§ 17, 18 (2d ed. 1949). Manifestly, where the public interest is involved, as it is in the enforcement of Section 5 of the Federal Trade Commission Act, a strict adherence to common law principles is not required in the determination of whether a parent should be held for the acts of its subsidiary, where strict adherence would enable the corporate device to be used to circumvent the policy of the statute. *See* Joseph A. Kaplan & Sons, Inc. v. Federal Trade Commission, 121 U.S.App.D.C. 1, 347 F.2d 785, 787 n. 4 (1965). *Cf.* Bowater S. S. Co. v. Patterson, 303 F.2d 369 (2d Cir. 1962), cert. denied, 371 U.S. 860, 83 S.Ct. 116, 9 L.Ed.2d 98 (Norris-LaGuardia Act); Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L. Ed. 406 (1940) (Revenue Act of 1932).

■ The Commission's conclusion that Crowell Collier dominated and controlled Collier & Son, and that they formed a single enterprise for the purposes of section 5, is supported by substantial evidence on the record as a whole, Section 5(c), Federal Trade Commission Act, 15 U.S.C. § 45(c) (1964); Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and is otherwise in accordance with the foregoing legal principles. The factual findings buttressing this conclusion, which shall be summarized below, were that the parent not only wholly-owned its Collier subsidiaries, but also that it: interchanged personnel with its subsidiaries and maintained common or overlapping officers and directors; operated through its subsidiaries, which were often created and dissolved for purposes unrelated to the business carried on by the corporate complex; approved the use by its subsidiaries of the parent's name and goodwill in order to develop favorable public associations between the parent and its subsidiaries; and possessed and exercised ultimate control over Collier & Son.

*Overlapping of officers and directors among the parent and its subsidiaries.* Between 1950 and the present date, the following corporations have sold Collier Encyclopedias:

| Sales Corporation | Operative Time Period |
|---|---|
| P. F. Collier & Son Corp. [# 1] | 1950—Jan. 2, 1952 |
| Crowell Collier [Through a Division] | Jan. 2, 1952—July 16, 1954 |
| P. F. Collier & Son Corp [# 2] | July 16, 1954—Dec. 30, 1960 |
| P. F. Collier, Inc. | Dec. 30, 1960—Present |

When P.F. Collier & Son Corp. [#1] was dissolved at the beginning of 1952, its sales managers went to work for Crowell Collier, and its three directors were also vice president, president, and chairman of the board of the parent company, as well as directors of the parent. Furthermore, the subsidiary's president was a vice president of the parent, and its treasurer, assistant treasurer, and secretary held the same positions in the parent.

For the next two years, when the parent sold the encyclopedias through a division, the officers of that division were the same men who had been officers of

the dissolved P.F. Collier & Son Corp. [#1].

When P.F. Collier & Son Corp. [#2] assumed the sales of encyclopedias in 1954, its four directors were also chairman of the board and treasurer of the parent, as well as two directors of the parent. Its president was a director of the parent, one of its vice presidents was treasurer of the parent, its treasurer was a director of the parent, and its secretary was also secretary of the parent.

In 1960, the year the complaint in this case was filed, the following individuals held overlapping positions in Crowell Collier and P.F. Collier & Son [#2]:

Positions Held, 1960

| Official | Crowell-Collier | P. F. Collier & Son Corporation |
|---|---|---|
| John Boe | V.P. | Pres., Dir. |
| Norman Bennett | V.P. | V.P., Dir. |
| E. J. McCaffrey | Treas. | V.P., Dir. |
| J. M. MacDonald | Sec. | Sec. |
| Wm. J. Sief | Controller | Treas., Controller, Dir. |
| Raymond C. Hagel | Pres., Dir. | Ch. of Bd. of Dir. |
| W. D. Cole | Ch. of Bd of Dir. | Dir. |
| Sumner Blossom | Vice Ch. of Bd. of Dir. | Dir. |

In 1961, after Collier, Inc. replaced P.F. Collier & Son Corp. [#2] as the selling entity, six of the ten officers of the subsidiary were also officers of the parent, and all seven directors of the subsidiary were officers or directors of the parent. In 1965, seven of the thirteen officers of the subsidiary were officers of the parent, and all five directors of the subsidiary were officers or directors of the parent.

From these and others of the Commission's findings, it is apparent that many of the men who directed the policy and operations of Crowell Collier also directed the policy and operations of its wholly-owned subsidiaries.

■ *Organizational manipulations.* In the determination of whether Crowell Collier may be held responsible for the acts of its subsidiaries, this Court must consider the "pattern and framework of the whole enterprise." Art National Mfrs. Dist. Co. v. Federal Trade Commission, 298 F.2d 476, 477 (2d Cir. 1962); Delaware Watch Company, Inc. v. Federal Trade Commission, 332 F.2d 745 (2d Cir. 1964). In so doing, this Court cannot overlook Crowell Collier's creation, dissolution, and replacement of lookalike subsidiaries throughout its existence, often for purposes unessential and unrelated to the maintenance of corporate vitality.

On January 14, 1939, in a case which it docketed as number 3687, the Federal Trade Commission issued a complaint against P.F. Collier & Son Corp., a New Jersey corporation, and the predecessor of P.F. Collier & Son Corp. [#1], a Delaware corporation. The complaint charged unfair and deceptive practices in connection with sales of encyclopedias. On July 25, 1939, the Board of Directors of Crowell Collier met and decided to dissolve the New Jersey corporation and reincorporate it in Delaware, in order to avoid certain taxes that were levied that year against all New Jersey corporations. On July 29, 1939, P.F. Collier & Son

Corp. [#1] was incorporated in Delaware. On September 28, 1939, P.F. Collier & Son, the New Jersey corporation, was merged into its parent, Crowell Collier, and subsequently the Commission ordered the case against it closed, for that reason.

On January 2, 1952, P.F. Collier & Son Corp [#1] was dissolved and merged into Crowell Collier. Mr. Eugene J. McCaffrey, an officer of the parent from 1951 to 1962, testified that the sole reason for dissolving P.F. Collier & Son Corp. [#1] was to separate the selling of magazines, the selling of books, and the collection of accounts to three of the parent's managers. He stated that the dissolution had nothing to do with pending legal proceedings, which he claimed to know nothing about. On cross examination, it was brought out that in 1952 the United States brought a criminal action against P.F. Collier & Son Corp. [#1] for violation of the Fair Labor Standards Act of 1938. A motion to quash service of process on the ground that P.F. Collier & Son Corp. [#1] was no longer in existence was sustained by the United States District Court for the Southern District of Indiana. However on appeal, in United States v. P.F. Collier & Son Corp., 208 F.2d 936 (7th Cir. 1953), the United States Court of Appeals reversed, holding that the dissolved corporation could be proceeded against either civilly or criminally as authorized by the laws of the State of Delaware.

On December 30, 1960, P.F. Collier & Son Corp. [#2], having been incorporated just six years earlier, was dissolved and merged into Crowell Collier, and on that same date Collier, Inc. was created. The sections in the articles of incorporation of P.F. Collier & Son [#2] and Collier, Inc. dealing with corporate purposes and the nature of business to be transacted are identical word for word. Under the merger agreement and resolution for the creation of Collier, Inc., substantially all of Collier & Son's assets were to be transferred to Crowell Collier, and then to be transferred from Crowell Collier to Collier, Inc. It is of no minor importance to note that Collier & Son was dissolved just eleven months after the filing of the complaint in this case, and that one of its defenses to this action is the Commission's alleged inability to proceed against a dissolved corporation.

Importantly, whenever Crowell Collier substituted a new subsidiary for a dissolved one, the corporate agents of the old and new subsidiaries were practically all the same people, albeit, perhaps, with different titles and occupying diffferent positions. And in all instances, the disappearance and re-emergence of the corporate subsidiaries was dictated by parental decision.

■ *Subsidiaries' use of the parent's name and reputation.* There is extensive evidence of the use by the Crowell Collier subsidiaries of the name, reputation, and goodwill of the parent. Where such a course of conduct reveals a calculated ploy by a subsidiary, with the knowledge and approval, however tacit, of the parent, to deceive the public into believing that it is dealing with the parent, when, in fact, it is dealing with a subsidiary, it is relevant to the issue of parental domination. And where, as in this case, there has been substantial overlap between the officers and directors of the parent and its subsidiaries, the requisite knowledge and approval may be inferred.

Between 1949 and 1962, Crowell Collier or its currently operative subsidiary, used order blank forms in the sales of Collier Encyclopedias, in which the parent was held out as the publisher of the encyclopedias. A form used in 1949 by P.F. Collier & Son Corp. [#1], for example, provides:

"The story of Collier's Encyclopedia. Its sponsors, with 75 years of experience in publishing educational books, part of a great organization responsible for the success of three of America's outstanding publications—Collier's, The American, and Woman's Home Companion magazines, expended more than a year in an exhaustive program of preliminary planning and

organizing this tremendous editorial undertaking."

This form is, in all respects, typical of forms used by Crowell Collier, P.F. Collier & Son [#2] and Collier, Inc. in subsequent years. While they may vary slightly in form, all are substantively identical. In addition, the 1962 form, used by Collier, Inc. provided:

"P.F. Collier, Inc.

The Crowell Collier Publishing Company

640 Fifth Avenue

New York 19, N.Y.."

In the sales presentations used by representatives of Collier & Son it was intimated that they were connected with Crowell Collier. The salesmen were instructed to introduce themselves as being from the former magazine publisher; or that they were from the Collier Company, which is the largest publisher in the world; or that, for the past 86 years, the name "Collier" has been recognized as meaning magazines. The second trial examiner found that substantially the same sales practices have been perpetuated by Collier, Inc.

Just as relevant, in this case, is the fact that the very names assigned to its subsidiaries by the parent could easily be mistaken for the name of the parent. Each subsidiary which has sold these encyclopedias has had the word "Collier" in its name. That sales agents and hiring personnel used this device to capitalize on the parent's reputation and goodwill cannot be doubted on this record. This device having been employed to deceive the public into believing that it is dealing with the parent, when in fact it is dealing with a subsidiary, it is evidence of parental domination for the purposes of the Federal Trade Commission Act, the very purpose of which is to prevent "deceptive acts or practices in commerce, * * *" 15 U.S.C. § 45(a) (1) (1964).

*Actual control by Crowell Collier over the affairs of its subsidiaries.* We find substantial evidence in the record as a whole to support the Commission's find-ings of actual interference by Crowell Collier in the day-to-day policies and operations of Collier & Son and Collier, Inc. We also find substantial evidence to support the Commission's finding that elements within the Crowell Collier corporate complex have never dealt with each other as independent commercial entities, and that they have interchanged business functions as the circumstances warranted in a manner which was wholly inconsistent with any purported corporate separation between the parent and the subsidiary.

In the alternative, however, the law is clear that where a parent possesses latent power, through interlocking directorates, for example, to direct the policy of its subsidiary, where it knows of and tacitly approves the use by its subsidiary of deceptive practices in commerce, and where it fails to exercise its influence to curb the illegal trade practices, active participation by it in the affairs of the subsidiary need not be proved to hold the parent vicariously responsible. Under these circumstances, complicity will be presumed. See Goodman v. Federal Trade Commission, 244 F.2d 584, 590 (9th Cir. 1957).

"The Commission was thus warranted in considering the harmonization of local policies [by the subsidiaries] with those [of the parent] as a fact, the absence of conflicts making affirmative action by [the parent] unnecessary. But it does not follow that [the parent's] domination of its system was any less real or effective. Historical ties and associations, combined with strategic holdings of stock, can on occasion serve as a potent substitute for more obvious modes of control." North American Company v. Securities Exchange Commission, 327 U.S. 686, 693, 66 S.Ct. 785, 790, 90 L.Ed. 945 (1946).

We find that Crowell Collier so dominated and controlled the acts of its Collier subsidiaries, that the corporate identities of the latter may be ignored, and the parent held vicariously responsible for their acts.

B. Whether Collier & Son, even though dissolved, and Collier, Inc. may properly be subjected to the Commission's order to cease and desist.

As was previously indicated, on December 13, 1960, approximately eleven months after the filing of the complaint in this case, the Board of Directors of Crowell Collier met. At that meeting, resolutions were adopted to dissolve Collier & Son, which dissolution became effective on December 30, 1960, and to create Collier, Inc., which was formed on December 22, 1960. As was also indicated, the Commission's 1966 order, which was made effective in 1969, applied not only to Collier & Son "under this or any other name," but also to "its successor or assign."

The petitioners argue that no order may issue against Collier & Son because it was dissolved in 1960;[7] that Collier, Inc. may not be included in any order because it was not named in the complaint; that Collier, Inc. cannot be reached vicariously through the dissolved Collier & Son.[8] We disagree.

 Ordinarily, since orders of the Federal Trade Commission operate prospectively, they may not be applied against dissolved corporations, for to do so would be a "useless act." Federal Trade Commission v. Ruberoid Company, 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1951); Galter v. Federal Trade Commission, 186 F.2d 810 (7th Cir. 1951), cert. denied, 342 U.S. 818, 72 S.Ct. 34, 96 L.Ed. 619; United Corporation v. Federal Trade Commission, 110 F.2d 473 (4th Cir. 1940); Chamber of Commerce of Minneapolis v. Federal Trade Commission, 13 F.2d 673 (8th Cir. 1926). It

is not "useless," however, to subject a dissolved corporation to an injunction in order to reach a successor corporation through which unlawful practices may be continued. See Goodman v. Federal Trade Commission, 244 F.2d 584 (9th Cir. 1957). The Federal Trade Commission would have no power at all if companies could circumvent its orders by dissolving and succeeding themselves prior to their issuance. Thus, where it is clearly shown that a dissolved corporation engaged in unfair and deceptive trade practices, and that its business has been continued by another, subsequently-formed corporation, the latter may be subject to the cease and desist order as well as the former. Cf. Walling v. James V. Reuter, Inc., 321 U.S. 671, 674–675, 64 S.Ct. 826, 828, 88 L.Ed. 1001 (1944) (Injunction to prevent future violations of the Fair Labor Standards Act).

"Not only is such an injunction enforceable by contempt proceedings against the corporation, its agents and officers and those associated with it in the conduct of its business, but it may, also, in appropriate circumstances, be enforced against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons. The vitality of the judgment in such a case survives the dissolution of the corporate defendant. And these principles may be applied in fuller measure in furtherance of the public interest * * than if only private interests were involved. [Citations omitted.]" Id.

This result does not depend upon the existence of a state statute authorizing the extension of corporate life for certain purposes,[9] Id., and may obtain even in

---

7. The petitioners' argument that the evidence of the substantive violations by Collier & Son is so stale as to vitiate the proceedings will be considered in the next section of this opinion.

8. The petitioners' objections to the legality of the remand proceedings, whereat the sole evidence of substantive violations by Collier, Inc. was taken, shall be considered in the next section.

9. Collier & Son and Collier, Inc. were both incorporated in Delaware. Title 8 of the Delaware Code Ann. § 278 (1953) extends the existence of dissolved corporations "until any judgments, orders or decrees therein shall be fully executed." This statute has been applied to extend the lives of dissolved corporations for the purpose of applying prospectively-operating administrative orders, National Labor Relations Board v. Weirton Steel Co.,

the presence of evidence that the substantive violation has been discontinued, provided it is capable of being resumed. Perma-Maid Company v. Federal Trade Commission, 121 F.2d 282 (6th Cir. 1941); Hershey Chocolate Corp. v. Federal Trade Commission, 121 F.2d 968 (3d Cir. 1941); Goodman v. Federal Trade Commission, 244 F.2d 584, 585 (9th Cir. 1957) and cases cited therein at 593, n. 22. *See also*, United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 307–310, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). *But see*, Galter v. Federal Trade Commission, 186 F.2d 810 (7th Cir. 1951).

▇▇▇▇ As a corollary to the foregoing legal principles, where it is shown that a successor corporation is the alter ego of the original respondent, it, as well as the dissolved corporation, may be subjected to the order. The question of successorship is one of fact, which turns on such considerations as: Whether both companies engaged in the same business; whether the successor has the capability to perpetuate, continue, or resume deceptive practices employed by the dissolved corporation; whether they have in common individuals who have served in similar corporate capacities; whether there is substantial identity of ownership between the dissolved and the operative corporation; and, in general, the circumstances surrounding the dissolution of the one and the establishment of the other. Stated differently, if the later corporation is "merely a disguised continuance" of the earlier, it may be subjected to a cease and desist order properly issued against the earlier. Southport Petroleum Company v. National Labor Relations Board, 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718 (1942); Reynolds Pallet & Box Company v. National Labor Relations Board, 324 F.2d 833 (6th Cir. 1963); Makela Welding, Inc. v. National Labor Relations Board, 387 F.2d 40 (6th Cir. 1967).

Our inquiry must be directed at these issues: Whether Collier & Son violated section 5; whether Collier, Inc. was a "successor" of Collier & Son capable and reasonably likely to perpetuate the illegal trade practices of Collier & Son.

▇▇▇▇ *Collier & Son.* We find substantial evidence in the record as a whole to support the Commission's findings that Collier & Son committed, for at least a substantial period of its corporate existence, the following illegal trade practices in violation of Section 5 of the Federal Trade Commission Act: Its agents, in the door-to-door sales of books, falsely represented that they were conducting a survey; that the encyclopedia was offered free or at a reduced price provided that yearly supplements were purchased; that the agent was connected with Collier & Son's or Crowell Collier's advertising or publicity department and was not selling anything; that the encyclopedia was offered free or at a reduced rate if the potential customers would comment on the set in a letter, and authorize their names to be used in advertising the encyclopedia; that theirs was a special offer for a limited time only and being made only to a select group of people and not to the public at large; that the general sales promotion would be conducted at a later date; that the annual supplement volume regularly sold for $10.00 but was being offered to the prospects for only $3.95; that certain additional books included in the combination offer were being given free with the purchase of encyclopedias and supplements; and that the encyclopedia was nationally advertised for $389 or more. The nationwide scope of these operations imparted the requisite interstate character.

*Collier, Inc.* As was indicated above, the decisions to dissolve Collier & Son and to establish Collier, Inc. were made by the Board of Directors the same day, shortly after the filing of the complaint

135 F.2d 494 (3d Cir. 1943); United States v. Line Material Co., 202 F.2d 929, 932 (6th Cir. 1953); Marcus, Suability

of Dissolved Corporations, 58 Harv.L. Rev. 675 (1945).

in this case. The stated purpose for this substitution of corporate entities was to facilitate certain accounting changes, which could be more easily accomplished by substituting a new corporation than by filing the requisite forms with the Internal Revenue Service.[10] As has been indicated above, this corporate change was but one of many similar formal subsidiary reorganizations effected by the parent to accomplish purposes unrelated and unessential to the maintenance of corporate vitality.

It has also been illustrated that the nature of the business and the objects or purposes to be transacted by Collier & Son and Collier, Inc., as specified by their articles of incorporation, were identical. The new subsidiary, like the old, was wholly-owned by Crowell Collier, and each occupied the same offices in the parent's building. During the last year of operation of Collier & Son and the first year of Collier, Inc., their officers, directors, and sales managers were nearly all the same people, performing the same functions. The organizational structures of the two corporations were identical.

Moreover, from unrebutted testimony, the second trial examiner found that as late as 1967, Collier, Inc. was employing the same unfair and deceptive trade practices as was Collier & Son between 1955 and 1960.[11]

■■■ Collier, Inc. argues that for it to be bound to the order, the Commission should have amended its complaint to include it, and should have held a new trial on the issue of its culpability. We find this argument to be without merit. Cf. NLRB v. Ozark Hardwood Company, 282 F.2d 1, 4 (8th Cir. 1960).

We find substantial evidence in the record as a whole to support the Commission's finding that Collier, Inc. was "merely a disguised continuance" of the dissolved Collier & Son, and is, therefore, subject to the order to cease and desist.

### III.

*Whether the remand proceedings were illegal.*

The petitioners argue that the Commission erred in 1966 in ordering remand proceedings on the grounds that, first, complaint counsel had had adequate opportunity at the original hearings to adduce evidence on the issues of domination and successorship; and, second, that by 1966, the proceedings had become unduly protracted. We reject both arguments.

Stripped of surplusage, the petitioners' first argument is that, in its 1966 decision, the Commission prejudged the issues of domination and successorship, found liability, decided that the evidence was insufficient to support its findings, and remanded the matter to obtain sufficient evidence to support its conclusion. The petitioners claim that they were, in essence, "tried" twice for the same offense in derogation of their right to due process of law. We find support for this argument neither in the facts of this case, nor in the law.

In his brief before the first Commission hearing, complaint counsel included reference to several pleadings and other public papers to prove that Collier, Inc. was the successor to Collier & Son, and that Crowell Collier dominated and controlled the acts of both subsidiaries. These papers were not before the first hearing examiner and the Commission was uncertain whether they were accurate, or properly before it. The Commission stated:

"If the information cited from the above sources is accurate and was properly before the commission in the

10. The same reason was given for the dissolution of P. F. Collier & Son Corp. [#1] in 1952.

11. This fact alone may be sufficient to hold Collier, Inc. a "successor" subject automatically to the order. Cf. NLRB v. ■■■■■■■

Downtown Bakery Corp., 330 F.2d 921, 925 (6th Cir. 1964); NLRB v. Herman Brothers Pet Supply, Inc., 325 F.2d 68, 70–72 (6th Cir. 1963); NLRB v. Colten, 105 F.2d 179, 182–183 (6th Cir. 1939).

form of probative evidence, we believe it would be relevant to the issue of the liability of P. F. Collier, Inc., and of the parent, Crowell-Collier Publishing Company. However, some doubt arises as to whether this information is properly before us. Moreover, P. F. Collier, Inc., not having been in existence at the time of the issuance of the complaint, and not having been organized until after the hearings were midway, has not offered any testimony on the issue of its status as a successor.

"In order to resolve any doubt whether the information referred to previously is properly before the Commission in the form of probative evidence and to afford P. F. Collier, Inc. an opportunity to be heard on the single issue of whether it is in fact the successor to P. F. Collier & Son Corporation, we are remanding this case for the limited purposes (1) of ascertaining the truth of this information and obtaining it in probative form; (2) to allow complaint counsel to offer evidence in support of his claim that P. F. Collier, Inc., is the successor corporation to respondent P. F. Collier & Son Corporation; and (3) to afford respondent Crowell-Collier Publishing Company and P. F. Collier, Inc., the opportunity to submit any evidence in rebuttal to that which may be submitted by complaint counsel." CCH Trade Reg.Rep., Par. 17,-748 at 23,066 (1965–67 Transfer Binder).

It also appeared to the Commission that the first trial examiner had improperly refused to admit certain evidence on these issues offered by complaint counsel.

■ We are hard put to find evidence of prejudgment by the Commission on this record. On the contrary, by remanding the case for further findings and not deciding it on the basis of mere suspicion, the Commission acted with deliberate regard not only for the protection of the petitioners' rights, but also for the interest of the public. Federal Trade Commission v. J. Weingarten, Inc., 336 F.2d 687, 695 (5th Cir. 1964), cert. denied, 380 U.S. 908, 85 S.Ct. 890, 13 L.Ed.2d 796 (1965).

"Under such circumstances, what is a Commission charged by statute with the serious responsibility of effectuating statutory policy to do? Must it, on the one hand, in the face of a record indicating substantial basis for a likely finding of statutory transgressions, simply acquiesce in a default, largely for technical, not substantive, deficiencies? Or must it, out of some supposed attitude of administrative advocacy, press on, leaving the respondent to its appeal to the Courts of Appeals whose dockets are already overcrowded without adding as grist to the judicial mill deficiencies which the administrative body is perfectly willing procedurally to correct." Id.

See P. Lorillard Co. v. Federal Trade Commission, 186 F.2d 52, 55 (4th Cir. 1950); Shein v. United States, 102 F. Supp. 320, 323 (D.N.J.1951), aff'd, 343 U.S. 944, 72 S.Ct. 1043, 96 L.Ed. 1349 (1952). Due process was not offended, and the petitioners' rights were not prejudiced, by the Commission's remand of the proceedings in 1966.

In a broader context, the petitioners' second argument is that these proceedings have dragged on for such a long period of time, the complaint having been originally filed in 1960, that the evidence is cold and stale, and the public interest would not be served by the enforcement of the Commission's order. In this regard, we share the petitioners' and the Supreme Court's indignation for the "nigh interminable" delays of administrative agencies in safeguarding the public welfare. Federal Power Commission v. Hunt, 376 U.S. 515, 527, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964); Atlantic Refining Company v. Public Service Commission of New York, 360 U.S. 378, 389, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959). The indications in this case are that both parties, the petitioners and the Commission, share responsibility for the protracted nature of the proceedings. Nevertheless, by tolerating such delays, the Federal

Trade Commission, which was created to expedite the prosecutions of those employing deceptive acts or practices in Commerce, becomes their accomplice. Dissenting from the opinion of the Commission remanding the case to a second trial examiner, Commissioner MacIntyre stated:

"Too often one of the members of the Commission and others have complained that the Federal Trade Commission is a fit article for a museum. Some of this criticism is directed against prolonged proceedings and ineffectiveness. To take part in this action of the majority is to help this criticism. I will not be so obliging. I dissent."

If this Court were confident that an injunction against this order would spur the Commission into more expeditious action in all subsequent cases, one should issue. In so doing, however, we would release two wrongdoers, and the public, not the Commission, would be the loser.

■■■■ For the purposes of this litigation, Crowell Collier, Collier & Son, and Collier, Inc. have been proven to form a single enterprise, with the parent dominating and controlling the acts of both subsidiaries, which are merely alter egos of one another. The violations shown to have been employed by Collier & Son, therefore, may be deemed those of the enterprise.[12] The fact that this evidence may be old, per se, does not mean that an order issued upon it is vitiated. Where an illegal trade practice is once proved against an enterprise, and is capable of being perpetuated or resumed, it may be presumed to have been continued, and an order may issue to prevent it, even upon a showing that it has been discontinued or abandoned.

See, e. g., Perma-Maid v. Federal Trade Commission, 121 F.2d 282 (6th Cir. 1941).[13]

■■■■ We find sufficient public interest in this controversy to warrant the issuance of an order. Federal Trade Commission v. Klesner, 280 U.S. 19, 30, 50 S.Ct. 1, 74 L.Ed. 524 (1929); Federal Trade Commission v. Royal Milling Company, 288 U.S. 212, 216, 53 S.Ct. 335, 77 L.Ed. 706 (1933).

IV.

*The lawfulness and propriety of the Commission's order.*

The petitioners object to that portion of the Commission's order which requires them to cease and desist from:

"Failing to disclose at the time admission is sought into the home, office or other establishment of the prospective purchaser or purchaser that the person making the call is respondent's salesman and is soliciting the sale of respondent's merchandise [and]

\* \* \* \* \* \*

"Using any plan, scheme or ruse as a door-opener to gain admission into a prospect's home, office or other establishment, which misrepresents the true status and mission of the person making the call."[14]

The petitioners do not argue that misrepresentation of the sort forbidden by this order is not violative of the Act, nor do they argue that they are not employing this deceptive device. They do argue that by forcing them affirmatively to disclose the nature of their business when they approach a prospective customer, the order puts them at a competitive disadvantage with other door-to-door book peddlers who have not been forbidden from doing the same thing.

12. In so holding, we do not rely upon the unrebutted testimony before the second examiner that Collier, Inc. engaged in similar illegal trade practices as late as 1967. This evidence was admitted for the sole purpose of proving continuity of Collier & Son's business by Collier, Inc., and was used by the Commission solely to prove successorship.

13. To the extent of any apparent inconsistency, we decline to follow Bearings, Inc., CCH Trade Reg.Rep., Par. 16,768 (1963–65 Transfer Binder).

14. The Commission's order is reproduced in full at n. 6, *supra*, pp. 265–266.

*See* American Marketing Associates, Inc., Dkt. 8727, CCH Trade Reg.Rep., Par. 18,182 (Feb. 5, 1968); The Child's World, Inc., CCH Trade Reg.Rep., Par. 20,892 (Nov. 14, 1968); Joseph J. Bidnick, an individual, trading and doing business as Standard Education Library, CCH Trade Reg.Rep., Par. 22,980 (1965–67 Transfer Binder); Basic Books, Inc., 56 FTC 69 (1959); Encyclopedia Britannica, Inc., 48 FTC 1416 (1952); Americana Corporation, 46 FTC 253 (1949); National Surveys, etc., 47 FTC 888 (1949).

It is well established that "the Commission has wide discretion in its choice of a remedy deemed adequate to cope with unlawful practices," Jacob Siegel Co. v. Federal Trade Commission, 327 U.S. 608, 611, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946), and that "it must be allowed effectively to close all roads to the prohibited goal, so that the order may not be by-passed with impunity." Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081 (1952). So long as there is a "reasonable relation" between the remedy and the unlawful practice, the courts will not interfere. Id. The fact that the orders issued against Crowell Collier's competitors were insufficient does not mean that the order in this case must also be. Such a situation would afford the basis for an argument that Collier's competitors should have been dealt with likewise, not that the petitioners should escape. Heavenly Creations, Inc. v. Federal Trade Commission, 339 F.2d 7 (2d Cir. 1964); Exposition Press, Inc. v. Federal Trade Commission, 295 F.2d 869 (2d Cir. 1961); International Art Company v. Federal Trade Commission, 109 F.2d 393 (7th Cir. 1940); National Candy Company v. Federal Trade Commission, 104 F.2d 999 (7th Cir. 1939). The purpose of Commission orders is not to put those employing deceptive acts or practices *in pari delicto* with each other.

## V.

The order of the Federal Trade Commission is enforced in its entirety.